## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re:  AUBREY JAY MILLER<br>        SHIRLEY ANN MILLER,<br><br>    Debtors. | Case No. 15-11394 SAH<br><br>Chapter 7 |
| ALLY FINANCIAL, INC.,<br>    Plaintiff,<br><br>v.<br><br>AUBREY JAY MILLER,<br>SHIRLEY ANN MILLER,<br>J. MILLER TRUCKING, INC.,<br>DEBORAH H. HUPFER,<br>COLLATERAL SERVICES OF<br>INDIANA,<br>  LLC,<br>FENNER & ASSOCIATES,<br>BRIAN FENNER, and<br>FRANCIS LENNIX,<br><br>    Defendants. | Adversary Proceeding<br>Case No.  15-01236 SAH |

### *SUPPLEMENTAL BRIEF IN SUPPORT OF*
### "MOTION TO DETERMINE PROCEEDING IS NON-CORE
### AS TO DEFENDANT, DEBORAH HOOVER-HUPFER" [DOC. 21]

DEBORAH HOOVER-HUPFER, a Defendant in the above-captioned adversary proceeding ("Hupfer"), herein submits to this Court a Supplemental Brief in Support of her "Motion to Determine Proceeding is Non-Core" (the "Motion") as filed with the Court on October 14, 2015 [Doc. 21].  Hupfer submits this Supplemental Brief to her Motion in accordance

with the Court's November 20, 2015 Order [Doc. 28].  In support of her requested relief, Hupfer respectfully avers, maintains, and states as follows.

*THE FACTS*

On July 22, 2015, Ally Financial, Inc. ("Ally"), a third-party Plaintiff, filed an Amended Complaint in the above-captioned adversary proceeding, alleging numerous causes of action against multiple Defendants, including Hupfer, a third-party Defendant [Doc. 2].  As to Hupfer, Ally alleged state-law claims of tortious interference with contract and conspiracy to commit fraud.  These state law claims against Hupfer have no conceivable impact on the Debtors' estate being administered in bankruptcy.

On August 24, 2015, Hupfer answered Ally's Amended Complaint [Doc. 11].  Therein, Hupfer generally and specifically denied liability and also asserted that any claims against her were not core proceedings.  In accordance with Rule 7008, Fed.R.Bankr.P., Hupfer also stated that she respectfully did not consent to entry of final judgments or orders by the Bankruptcy Court.

On October 13, 2015, Hupfer filed a "Jury Trial and Jurisdiction Acknowledgements and Consents" form with the Court [Doc. 17].  Therein, Hupfer reiterated that she did not consent to the entry of final orders and judgments by the Court, whether or not the causes of action alleged against her are designated "core" or "non-core".  Hupfer is neither a creditor nor a debtor in the underlying Chapter 7 case.  Rather, Hupfer is merely a non-

filing co-defendant in the adversary proceeding, and, respectfully, is not subject to the Bankruptcy Court's jurisdiction absent her knowing and voluntary consent.

*BRIEF IN SUPPORT*

The only issue the Court is asked to decide is whether Ally's claims against Hupfer constitute a "core proceeding".  Defendant reserves the right to contest, if necessary, the subject matter jurisdiction of the District Court under 28 U.S.C. §1334(b).

In general, bankruptcy courts "may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11", also known as "core proceedings."   28 U.S.C. §157(b)(1); *In re Houlik*, 481 B.R. 661, 673-74 (10th Cir. BAP 2012). *Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*, _____ F.3d _____, (10th Cir. July 28, 2015) (attached to this Brief for the Court's convenience).

According to Tenth Circuit precedent, core proceedings are "proceedings which have no existence outside of bankruptcy.  Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings."   *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990) (per curium); *In re Ray*, 624 F.3d 1124, 1133 (9th Cir. 2010); *In re Wilshire Courtyard*, 459 B.R. 416, 424-26 (9th Cir. BAP 2011); *Houlik*, 481 B.R. at 674 (no core proceeding where resolution of the claim does not require the interpretation

3

or enforcement of bankruptcy law); *In re Rael*, BAP No. WY-14-035 (10th Cir. BAP, February 27, 2015) (unpublished) (discussing the holding of *Houlik*).

When a "'claim is a state law action… and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy,' it implicates private rights and thus is not amenable to final resolution by the bankruptcy court." *Loveridge*, *supra* at *8, quoting *Stern v. Marshall*, 131 S.Ct. 2594, 2611 (2011). Thus, according to recent Tenth Circuit precedent, "cases properly in federal court but arising under state law and not necessarily resolvable in the claims allowance process trigger Article III's protections." *Id.* at *9.

Applying the law to the facts at hand, it is clear to see that the claims alleged by Ally against Hupfer are not core. Ally, a third-party Plaintiff, asserts state-law claims against Hupfer, a third-party Defendant. These claims do not arise from bankruptcy law, nor do they require an interpretation of bankruptcy law to decide. These claims do not relate to the administration of the Debtors' Chapter 7 estate, nor do they in any way affect the claims process within the Chapter 7 case. With all due respect to the Court, Hupfer cannot imagine a more clearer example of a non-core proceeding than this case.

The cases cited by the Plaintiff do not support its contention that its claims are core <u>as to Hupfer</u>. *In re Parsons*, Case No. 15-30263 (Bankr. N.D. N.Y. June 5, 2015); *In re McCann*, Case No. 15-35045 (Bankr. S.D.

4

N.Y. Oct. 28, 2015).  First, neither case involved claims against the Debtor's attorney.  Second, in the *Parsons* case the Court exercised jurisdiction under 11 U.S.C. §362, an action not asserted by Ally against any of the Defendants in this proceeding.  Third, in the *McCann* case the Court exercised jurisdiction under its turnover powers pursuant to 28 U.S.C. §157(b)(2)(E), again an action not asserted by Ally against Hupfer in this proceeding.  It is also important to note that Ally devotes a substantial amount of its Response to urging the Court to retain its advisory status in this proceeding in the event the District Court ultimately has to decide the matter, largely conceding the non-core status of its claims.  In summary, Defendant respectfully avers that that the claims asserted against her by Ally are non-core, and the Court's jurisdiction simply cannot extend to affording the relief Ally is requesting.

WHEREFORE, given the above-stated facts and arguments, Deborah Hoover-Hupfer again requests that the Court enter an Order finding that the causes of action set forth against her by Ally are non-core; that the Court dismiss the adversary proceeding as to her for lack of jurisdiction, and; for other such relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

/s/ Jerry D. Brown
Jerry D. Brown, OBA #16815

5

JERRY D. BROWN, P.C.
5500 N. Western, Suite 150
Oklahoma City, OK 73118
(405) 841-1000
(405) 841-1001 (Fax)
jdbrownpc@sbcglobal.net
Attorney for Deborah Hoover-
Hupfer, Defendant

## CERTIFICATE OF SERVICE

I, Jerry D. Brown, hereby certify that on the _____2_____ day of December
15, a true and correct copy of the above and foregoing instrument was
mailed, with proper postage prepaid, to the following parties:

Liberty Law, PLLC
1530 N. Harrison
Suite # 317
Shawnee, OK 74804


/s/ Jerry D. Brown_____
Jerry D. Brown, OBA #16815

FILED
United States Court of Appeals
Tenth Circuit

**July 28, 2015**

UNITED STATES COURT OF APPEALS

Elisabeth A. Shumaker
Clerk of Court

**TENTH CIRCUIT**

In re: RENEWABLE ENERGY
DEVELOPMENT CORPORATION,

     Debtor.

ELIZABETH R. LOVERIDGE,
Chapter 7 Trustee,

     Plaintiff,

v.

TONY HALL; ELLIS-HALL
CONSULTANTS, LLC; SUMMIT
WIND POWER, LLC; SSP, a trust,
Scott Rasmussen-Trustee; CLAY R.
CHRISTIANSEN; DIANE E.
CHRISTIANSEN; RICHARD D.
FRANCOM; STEPHEN K. MEYER;
BONNIE G. MEYER; DOES I-X;

     Defendants,

and

SUMMIT WIND POWER, LLC;
KIMBERLY CERUTI, an individual,

     Third-Party Plaintiffs -
     Appellants,

v.

PARSONS KINGHORN HARRIS, a
professional corporation; GEORGE B.

No. 14-4001

HOFMANN; MATTHEW M. BOLEY;
KIMBERLEY L. HANSEN; VICTOR
E. COPELAND; LISA R. PETERSON;
MELYSSA DAVIDSON, individuals,

     Third-Party Defendants -
     Appellees.

---

### ORDER

---

Before **TYMKOVICH**, **GORSUCH**, and **PHILLIPS**, Circuit Judges.

---

This matter is before the court on the appellees' petition for panel rehearing. The petition is denied. The panel has determined, however, that *sua sponte* amendment of the original opinion is in order. An amended version of the opinion issued July 10, 2015, is attached and shall be issued nunc pro tunc to the original filing date.

ENTERED FOR THE COURT

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker, Clerk

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

In re:  RENEWABLE ENERGY
DEVELOPMENT CORPORATION,

     Debtor.

—————————————————

ELIZABETH R. LOVERIDGE,
Chapter 7 Trustee,

     Plaintiff,

v.

TONY HALL; ELLIS-HALL
CONSULTANTS, LLC; SUMMIT
WIND POWER, LLC; SSP, a trust,
Scott Rasmussen-Trustee; CLAY R.
CHRISTIANSEN; DIANE E.
CHRISTIANSEN; RICHARD D.
FRANCOM; STEPHEN K. MEYER;
BONNIE G. MEYER; DOES I-X;

     Defendants,

and

SUMMIT WIND POWER, LLC;
KIMBERLY CERUTI, an individual,

       Third Party Plaintiffs -
       Appellants,

v.

No. 14-4001

PARSONS KINGHORN HARRIS, a
professional corporation; GEORGE B.
HOFMANN; MATTHEW M. BOLEY;
KIMBERLEY L. HANSEN; VICTOR
E. COPELAND; LISA R. PETERSON;
MELYSSA DAVIDSON, individuals,

      Third Party Defendants -
Appellees.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:12-CV-00771-RJS)**

---

Stephen Q. Wood (Mary Anne Q. Wood with him on the briefs) of Wood
Balmforth LLC, Salt Lake City, Utah, for Third Party Plaintiffs-Appellants.

Stuart H. Schultz of Strong & Hanni, Salt Lake City, Utah for Third Party
Defendants-Appellees.

---

Before **TYMKOVICH**, **GORSUCH**, and **PHILLIPS**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

This case has but little to do with bankruptcy. Neither the debtor nor the
creditors, not even the bankruptcy trustee, are parties to it. True, the plaintiffs
claim they once enjoyed an attorney-client relationship with a former bankruptcy
trustee. True, they now allege the former trustee breached professional duties due
them because of conflicting obligations he owed the bankruptcy estate. But the

2

plaintiffs seek recovery only under state law and none of their claims will be necessarily resolved in the bankruptcy claims allowance process. And to know that much is to know this case cannot be resolved in bankruptcy court. The bankruptcy court may offer a report and recommendation. It may even decide the dispute if the parties consent. But the parties are entitled by the Constitution to have an Article III judge make the final call. So the district court's ruling otherwise — its decision to send the dispute to an Article I bankruptcy court for final resolution without their consent — violates the Constitution's commands and must be corrected.

Conflicts of interest often spell trouble for lawyers. The rules are complex and missteps happen. And at least as the complaint in this case tells it, a misstep happened here. When Renewable Energy Development Corporation (REDCO) found itself facing Chapter 7 proceedings, the bankruptcy court appointed attorney George Hofmann to serve as trustee for the estate. REDCO was in the wind business and its assets included lease options with private property owners who agreed to allow wind farms on their lands. As trustee, Mr. Hofmann was eager to ascertain the value of REDCO's leases so he consulted another client of his with expertise in the field — Kimberly Ceruti, the owner of Summit Wind Power, LLC. The pair eventually discovered that REDCO had failed to pay some property owners the consideration it owed them. As a result, Mr. Hofmann

3

allegedly concluded that REDCO's options were unenforceable and even encouraged Summit to pursue its own leases with the same individuals. Which it promptly did.

What started off sounding like a good idea and maybe even a win-win for REDCO and Summit soon yielded a rat's nest of conflicts. On further study, Mr. Hofmann came to the view that the property owners couldn't cancel their leases with REDCO in favor of Summit without first giving REDCO a chance to cure its nonpayment. And, in Mr. Hofmann's estimation, the chance to cure was a valuable opportunity for REDCO and its creditors. So he asked Summit to forgo its new leases in favor of REDCO's old ones. Summit refused. Things got so testy that Mr. Hofmann, yes, brought an adversarial proceeding in bankruptcy court against one client (Summit) on behalf of another (the REDCO estate). Unsurprisingly, Summit responded with state law claims against Mr. Hofmann and his law firm, alleging legal malpractice, breaches of fiduciary duties, and a good many other things besides. Mr. Hofmann, by now irredeemably conflicted, was replaced as trustee.

How do these unfortunate but hardly uncommon (and still unproven and only alleged) facts yield a dispute of constitutional magnitude? Summit filed suit in federal court against Mr. Hofmann alleging diversity jurisdiction and the right to have the case resolved in an Article III court. Mr. Hofmann replied that the case belonged in and should be resolved by an Article I bankruptcy court.

4

Ultimately, the district court sided with Mr. Hofmann even as it acknowledged some uncertainty about this much and certified its decision for an immediate appeal.

The Constitution assigns "[t]he judicial Power" to decide cases and controversies to an independent branch of government populated by judges who serve without fixed terms and whose salaries may not be diminished. U.S. Const. art. III, § 1. This constitutional design is all about ensuring "clear heads . . . and honest hearts," the essential ingredients of "good judges." 1 Works of James Wilson 363 (J. Andrews ed., 1896) (alteration omitted), *quoted in Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011). After all, the framers lived in an age when judges had to curry favor with the crown in order to secure their tenure and salary and their decisions not infrequently followed their interests. Indeed, the framers cited this problem as among the leading reasons for their declaration of independence. The Declaration of Independence ¶ 11; *Stern*, 131 S. Ct. at 2609. And later they crafted Article III as the cure for their complaint, promising there that the federal government will never be allowed to take the people's lives, liberties, or property without a decisionmaker insulated from the pressures other branches may try to bring to bear. *Stern*, 131 S. Ct. at 2609. To this day, one of the surest proofs any nation enjoys an independent judiciary must be that the government can and does lose in litigation before its "own" courts like anyone else.

5

Despite the Constitution's general rule, over time the Supreme Court has recognized three "narrow" situations in which persons otherwise entitled to a federal forum may wind up having their dispute resolved by someone other than an Article III judge. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64 (1982) (plurality opinion). Cases arising in the territories or the armed forces or those involving "public rights" may be sent to Article I tribunals of Congress's creation even if decisionmakers there do not enjoy the same insulation and independence as Article III judges. *Id.* at 63-72. Bankruptcy courts are, of course, legislative creations of just this sort. And because they don't have a thing to do with the territories or armed forces, the Supreme Court has suggested that their lawful charter depends on and is limited by public rights doctrine.

As developed to date, public rights doctrine has something of "a potluck quality" to it. *Waldman v. Stone*, 698 F.3d 910, 918 (6th Cir. 2012) (Kethledge, J.). The original idea appears to have been that certain rights belong to individuals inalienably — things like the rights to life, liberty, and property — and they may not be deprived except by an Article III judge. Meanwhile, additional legal interests may be generated by positive law and belong to the people as a civic community and disputes about their scope and application may be resolved through other means, including legislation or executive decision. *See Stern*, 131 S. Ct. at 2612; Caleb Nelson, *Adjudication in the Political Branches*,

6

107 Colum. L. Rev. 559, 566-72 (2007). But the boundary between private and public rights has proven anything but easy to draw and some say it's become only more misshapen in recent years thanks to seesawing battles between competing structuralist and functionalist schools of thought. *Compare, e.g.*, *Northern Pipeline*, 458 U.S. 50, *and Stern*, 131 S. Ct. 2594, *with Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), *and Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015). Indeed, the Court itself has acknowledged, its treatment of the doctrine "has not been entirely consistent." *Stern*, 131 S. Ct. at 2611; *see also* S. Elizabeth Gibson, *Jury Trials and Core Proceedings: The Bankruptcy Judge's Uncertain Authority*, 65 Am. Bankr. L.J. 143, 168-175 (1991) ("How a majority of the Court could have embraced these opposing views of article III within the span of less than a decade is difficult to understand," *id.* at 174).

   Bankruptcy courts bear the misfortune of possessing ideal terrain for testing the limits of public rights doctrine and they have provided the site for many such battles. *See Northern Pipeline*, 458 U.S. 50; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Stern*, 131 S. Ct. 2594. Even today, it's pretty hard to say what the upshot is. Through it all, the Supreme Court has suggested that certain aspects of the bankruptcy process may implicate public rights and thus lawfully find resolution in Article I courts. *See, e.g.*, *Northern Pipeline*, 458 U.S. at 71 (plurality opinion); *Granfinanciera*, 492 U.S. at 56 n.11; *Stern*, 131 S. Ct. at 2614

7

n.7. But the Court has also emphasized time and again that not every "proceeding [that] may have *some* bearing on a bankruptcy case" implicates a public right amenable to resolution in an Article I tribunal. *Stern*, 131 S. Ct. at 2618.

That much, of course, hardly decides cases. What most everyone wants to know is *which* aspects of typical bankruptcy proceedings do and don't implicate public rights. Yet even *Stern*, perhaps the Court's most comprehensive tangle with the question, offered no comprehensive rule for application across all cases. Instead, it invoked a number of different factors to support the result it reached in the particular and rather unusual case at hand. *Id.* at 2614 (justifying its decision because the case at hand didn't "fall within any of the varied formulations of the public rights exception in this Court's cases"); *see also id.* at 2621 (Scalia, J., concurring) (noting the "surfeit" of factors and formulations offered by the majority); Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After* Stern v. Marshall, 86 Am. Bankr. L.J. 121, 172 (2012).

But along the way *Stern* did clearly take at least one thing off the table. It held that when a "claim is a state law action . . . and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," it implicates private rights and thus is not amenable to final resolution in bankruptcy court. *Stern*, 131 S. Ct. at 2611. Indeed, the Court repeated this point — repeatedly. *See id.* at 2617, 2618, 2620. So whatever else you might say in the midst of this still-very-

8

much-ongoing battle over bankruptcy and public rights doctrine, you can say this much: cases properly in federal court but arising under state law and not necessarily resolvable in the claims allowance process trigger Article III's protections.

Happily, too, this is all the guidance we need to answer this appeal. While the parties before us agree on little else, they agree that Summit's claims against Mr. Hofmann and his firm are properly heard in federal court under the federal diversity statute, that they arise under state law, and that none will necessarily be resolved in the process of allowing or disallowing claims against the estate. Accordingly, we can be sure this is not the sort of case that may be forcibly shipped to an Article I bankruptcy court for final decision. The parties may waive their right to an Article III forum and choose to have their claims resolved in bankruptcy court. *Wellness Int'l Network*, 135 S. Ct. at 1939. But a district court may not — as the district court did here — send parties entitled to an Article III court to an Article I forum for final decision without their consent.

Mr. Hofmann resists this result by suggesting that Summit's claims are factually "intertwined" with the bankruptcy proceedings and for this reason belong in bankruptcy court. After all, he says, any harm that happened here happened only because of a conflict of interest arising from his service as a bankruptcy trustee. This much may be true but it equally strikes us as irrelevant. As we read *Stern*, it doesn't leave room for the notion that a claim independently

9

arising under state law and not necessarily resolvable in the claims allowance

process — but "factually intertwined" with bankruptcy proceedings — may be

sent to bankruptcy court for final resolution without consent. As we see it, the

only "intertwining" *Stern* cares about concerns the law, not the facts. In the

process of rejecting the idea that the claim before the Court implicated public

rights doctrine, *Stern* observed (among other things) that the claim was not

"intertwined with a federal regulatory program Congress has power to enact" but

arose instead under state law. 131 S. Ct. at 2614 (quoting *Granfinanciera*, 492

U.S. at 54). The Court pointed out that prototypical public rights disputes arise

from "federal statutory scheme[s]" while "quintessential[]" private rights disputes

involve common law rights affecting personal life, liberty, or property. *Id.* at

2614, 2618. In this way, the Court did suggest the source of law generating a

claim may inform its categorization as involving a public or private right. But the

Court nowhere suggested that any claim "factually intertwined" with bankruptcy

may be sent to bankruptcy court for final resolution without consent.

We confess we're glad of this. Asking what source of law generated the

claim at issue may well raise some questions around the edges — like what about

claims pursuing fraudulent conveyances, which find a home in a federal statute

but surely implicate longstanding common law rights? *See Granfinanciera*, 492

U.S. at 56. Still, questions like these aren't a patch on what would be involved if

in each case we had to ask whether the plaintiff's claims are "factually

10

intertwined" with a bankruptcy proceeding. If, as Mr. Hofmann submits, our case
is "factually intertwined" enough with bankruptcy to warrant its resolution in
bankruptcy court — just because a trustee in the bankruptcy happened to generate
a conflict of interest with a client outside the bankruptcy — what wouldn't be?
What if a trustee and creditor came to blows in the courthouse parking lot over
the terms of a proposed reorganization plan? What if a trustee stole from a third
person and gave the money to the bankruptcy estate? Couldn't someone plausibly
describe disputes like these as at least as "factually intertwined" with bankruptcy
as our own?

The implausibility of Mr. Hofmann's "factually intertwined" test as a
viable interpretation of *Stern* and its inadvisability as a practical matter are
further underscored by this. If we were to adopt his test, you could make a pretty
good argument *Stern* itself would have had to come out the other way. In *Stern*
the debtor brought a tort counterclaim against a creditor in hopes of enlarging the
bankruptcy estate and the Supreme Court found the allegation sufficient to trigger
the bankruptcy court's "core" authorities. 131 S. Ct. at 2604. That sounds pretty
"factually intertwined." Yet the Court held the case triggered Article III's
protections. A similar sort of problem may recur with *Granfinanciera* too. There
the debtor allegedly engaged in a fraudulent conveyance to hide assets from the
bankruptcy estate. Though the Court decided the case on other grounds (the
Seventh Amendment), *Stern* seemed to suggest that fraudulent conveyance cases

11

involve private rights and thus are of the sort that (absent consent) must be decided in Article III courts. *See id.* at 2614 n.7 (describing *Granfinanciera* as teaching that "Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court"); *see also In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 563 (9th Cir. 2012) *aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). Even though, surely, one could argue fraudulent conveyance claims are usually (always?) "factually intertwined" with the bankruptcy process because they challenge efforts to evade it. That Mr. Hofmann's proposed test would place us at odds with what the Supreme Court has decided in *Stern* — and at least suggested about *Granfinanciera* — does much to make us skittish of following where he would have us go.

Notably, many circuits to come this way before us have read *Stern* much as we do. In fact, some have even read the decision as claiming a good deal more ground for Article III than we must to resolve this appeal. The Ninth Circuit, for one, has suggested that only the second portion of the *Stern* test we've discussed — whether the matter would necessarily be resolved in the claims allowance process — must be satisfied to trigger Article III's protections. After all, the Ninth Circuit has noted, *Granfinanciera* involved a claim at least nominally arising from federal statute (not state law), yet it's one *Stern* seemed to suggest belongs on the private side of the rights ledger. *In re Bellingham*, 702 F.3d at

12

564. Neither is the Ninth alone in this view. *See, e.g.*, *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1192 (11th Cir. 2015) (holding that a bankruptcy court had authority to decide a state law dispute that was necessarily resolved in the claims allowance process); *In re Frazin*, 732 F.3d 313, 320-24 (5th Cir. 2013) (invoking the claims allowance process to explain why a bankruptcy court could decide certain state law claims but not others); *Waldman*, 698 F.3d at 921 (finding an Article III problem because "there was never any reason to think that" the debtor's "disallowance claims would necessarily resolve his affirmative [state law] claims"). To decide the case before us, however, we do not have to travel so far for both of the factors *Stern* discussed are present here and surely all the circuits to have spoken on the subject would agree their combination is enough (maybe more than enough) to invite Article III's application.

Mr. Hofmann brushes aside these authorities and asks us to find inspiration instead in *Albert v. Site Mgmt., Inc.*, 506 B.R. 453 (D. Md. 2014), and *In re Refco Inc.*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011). But neither of these cases acknowledges *Stern*'s direction that a case meeting both of the conditions we've discussed is entitled to an Article III forum. Neither of these cases appears reconcilable with the most thoughtful circuit learning on the subject we've just outlined. *Refco* even admits that its result is in tension with *Stern*, going so far as to acknowledge that the Supreme Court would likely reject its result. *Refco*, 461 B.R. at 191; *see also In re Lyondell Chem. Co.*, 467 B.R. 712, 721 (S.D.N.Y.

13

2012) (agreeing with *Refco*'s self-assessment). And it can come as no surprise that a court's well-reasoned confession its ruling runs afoul of Supreme Court precedent is enough to send us packing in the other direction.

Perhaps what Mr. Hofmann, the district court, and these authorities are aiming at is something different and a good deal more plausible than an extension of public rights doctrine to cases "factually intertwined" with bankruptcy. In places, you could read them all as suggesting less that cases like ours qualify as bona fide public rights disputes and more that we should consider recognizing a fourth qualification to Article III, one particular to bankruptcy, to cover them. And somewhere in here there may be a good argument premised on historical understanding. At the time of the founding, English bankruptcy commissioners could "summarily" decide matters related to the disposition of property in the bankruptcy estate — a sort of equitable *in rem* authority to administer and dispose of the bankrupt's assets for the benefit of his creditors. But bankruptcy commissioners could not resolve "plenary" suits involving outside parties or questions about what property belonged in or out of the bankruptcy estate. Such matters had to be resolved before a judge. Congress's early attempts to implement a nationwide bankruptcy system reflected this same jurisdictional divide. *See* Brubaker, *supra*, at 123-30; *Arkison*, 134 S. Ct. at 2170. And there's a colorable argument that Article III should be read in light of this historical practice. You might even rationalize *Stern* and other existing cases along these

14

lines. After all, *Stern*'s second condition, focusing on the amenability of a claim to resolution in the bankruptcy claims process, could be read as suggesting that the constitutional line falls along something like the old summary-plenary divide. So might *Stern*'s suggestion that fraudulent conveyance claims belong in an Article III court despite the fact they sometimes nominally arise from federal statute. And so might the logic behind the Ninth Circuit's decision in *Bellingham* and similar circuit decisions elsewhere.

Recognizing the summary-plenary line as the operative constitutional boundary in bankruptcy may have the virtue of consistency with historical practice and afford lower courts (some of) the guidance they've long wanted. *See* Brubaker, *supra*, at 123-30. It might also have the virtue of avoiding further entanglements with public rights doctrine in this area — a doctrine that's not only pretty hard to get your hands around, but one that on even a good day may be poorly suited to the task of allocating decisonmaking authority in bankruptcy given (after all) that bankruptcy involves the disposition of *private* assets between *private* parties. It's perhaps telling in this regard that, despite suggesting some aspects of bankruptcy implicate only public rights, precisely none of the Court's Article III bankruptcy cases has yet upheld a bankruptcy court's decision on this basis. And perhaps telling, too, that several Justices have expressed openness to exploring the use of historical practice as a basis for the constitutional boundary between Article I and Article III in the bankruptcy context. *See Wellness Int'l*

15

*Network*, 135 S. Ct. at 1951 (Roberts, C.J., dissenting); *id.* at 1967-68 (Thomas,

J., dissenting); *Stern*, 131 S. Ct. at 2621 (Scalia, J., concurring); *see also*

Brubaker, *supra*, at 164-67; Gibson, *supra*, at 170.

Still, it's hardly clear that pursuing this idea further would help Mr.

Hofmann. For this case doesn't involve the administration or distribution of

estate assets and it would seem to fit pretty neatly on the plenary side of the line.

Even more problematically still, while the district court discusses a possible

argument in this direction, Mr. Hofmann's brief does no more than allude to it.

And because entertaining an argument for drawing a new doctrinal boundary

between Article I and Article III in the bankruptcy context would require us to

confront highly "difficult constitutional question[s]" that are "not adequately . . .

briefed," we are naturally reluctant to venture farther into this dark wood without

more help from counsel. *Wellness Int'l Network*, 135 S. Ct. at 1970 (Thomas, J.,

dissenting). After all, what looks a promising possibility from afar often reveals

scraggly particulars on closer encounter. So in the end we think the prudent

course is to leave Mr. Hofmann's allusion where we find it and defer its

resolution for another case where it may be more fully explored by the parties.

Still, that's not the end of our encounter with this appeal. It isn't because

saying (as we do) that a bankruptcy court may not *decide* this case without the

parties' consent under *Stern* doesn't necessarily mean it cannot *hear* the case and

offer a report and recommendation about its disposition to a district court.

16

Indeed, as the Supreme Court has recently explained, where (as here) we are faced with a "*Stern* claim"— a claim the bankruptcy court is statutorily but not constitutionally authorized to decide and for which it has not received the parties' consent to proceed — it's still possible under 28 U.S.C. § 157(c)(1) and consistent with Article III for a bankruptcy court to "hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Arkison*, 134 S. Ct. at 2173. In cases like this, the bankruptcy court may act as a sort of magistrate or special master, an adjunct to the decisionmaker, not the decisionmaker itself — and in this way honor both statutory and constitutional commands. *Id.* So while Summit is right and the district court erred in sending Mr. Hofmann's case to bankruptcy court for final decision, the district court remains free on remand to refer the case to a bankruptcy court for a report and recommendation.

Summit resists this result, fighting even a temporary trip to bankruptcy court for a report and recommendation. For a bankruptcy court to *hear* a claim as a matter of statutory law, Summit notes, 28 U.S.C. § 157(a) instructs that the claim must "aris[e] under title 11 or aris[e] in or relate[] to a case under title 11," the federal bankruptcy code. And Summit says this requirement isn't met in this case because the parties' fight is so far removed from bankruptcy that it can't be said to "aris[e] under title 11 or aris[e] in or relate[] to a case under title 11." But whatever other problems might attend this line of argument one is by now

17

familiar: it wasn't made before the district court and is therefore another one we may and do decline to resolve in this appeal. *See Waldman*, 698 F.3d at 917.

Not ready to give up quite so easily on its effort to avoid even a short detour from district court, Summit suggests we cannot ignore and must resolve its argument because it implicates the subject matter jurisdiction of the federal courts. But that much it does not — quite — do. The statute Summit invokes, 28 U.S.C. § 157, involves only the allocation of responsibility between the bankruptcy and district court; it does not "implicate questions of subject matter jurisdiction." *Stern*, 131 S. Ct. at 2607. We acknowledge that § 157(a) shares similar language with 28 U.S.C. § 1334(b) — and we readily accept that statute *is* jurisdictional: quite expressly it provides district courts with "jurisdiction" over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." So maybe Summit's § 157(a) argument could be transferred to § 1334(b), and maybe the argument could present a successful jurisdictional challenge there. But if it did, it wouldn't be just the bankruptcy court that would lack jurisdiction to hear and report on this case. The district court itself would have no authority to hear the case either for § 1334(b) expressly governs its jurisdiction too.

Anxious to remain in federal court — just not ever visit bankruptcy court — Summit shirks from acknowledging this, the full consequences of its argument, and nowhere mentions § 1334(b) in its opening brief or how its argument might

18

apply to that statute. And, happily for everyone, we don't have to address the
question on our own motion either, even though it does implicate subject matter
jurisdiction. We don't because, whether or not the district court has jurisdiction
to decide this case under § 1334(b), everyone acknowledges it clearly has
jurisdiction to do just that under § 1332(a) given that the complaint alleges
complete diversity of citizenship and a sufficient amount in controversy. *See,
e.g.*, *Penteco Corp. Ltd. P'ship–1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519,
1521 (10th Cir. 1991).

At the end of the day, then, we are confident that the district court
possesses subject matter jurisdiction to hear this case at least under the diversity
statute, that Summit is entitled under *Stern* to have an Article III district court
resolve its claims, and that the district court may refer the case to an Article I
bankruptcy court for a report and recommendation. Many other questions remain
for tomorrow. But resolving this much is enough work for today. The case is
remanded to the district court for further proceedings consistent with this opinion.

19